**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN J. DONNELLY,** | ) | |
| | ) | **No. 11 CV 3154** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **October 16, 2012** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

The social security benefits framework provides a safety valve for people who do not timely apply for benefits because they are misinformed by employees of the Social Security Administration ("SSA") about their eligibility to receive them. *See* 42 U.S.C. § 402(j)(5). Where it is shown to the Commissioner's satisfaction that a claimant missed out on benefits after being misled by one of its employees, the claimant is deemed to have applied for the relevant benefits either as of the date on which the claimant was misinformed or the date on which he met all of the eligibility requirements—whichever comes later. *Id.* John Donnelly claims that staff at his local SSA office misinformed him about his eligibility to receive widower's insurance benefits beginning at age 60 and retirement insurance benefits beginning at age 62. He started receiving retirement insurance benefits at age 65, but now he seeks widower's insurance benefits he says he was entitled to receive from age 60 to 62 and back payment of the retirement insurance benefits he says he was eligible to receive from age 62 to 65. *See* 42 U.S.C. § 402(j)(5); 20 C.F.R. § 404.633. Currently before the court

is Donnelly's motion for summary judgment challenging the SSA's rejection of his applications for those payments. For the following reasons, the motion is denied:

## Procedural History

Donnelly applied for retirement insurance benefits on September 9, 2008, and he started receiving monthly benefit payments that same month. (A.R. 56, 74-76.) On November 3, 2008, Donnelly submitted a request for reconsideration, arguing that in 2003 and 2005 he was misled by SSA employees into believing that he was not eligible for earlier retirement and widower's insurance benefits. Donnelly sought to receive back payments of the benefits. (Id. at 92-93.) When he was told that his request for reconsideration had been lost, Donnelly submitted another request for reconsideration on November 13, 2008. (Id. at 79-91.) An SSA district manager denied his request in an initial consideration determination on March 27, 2009. (Id. at 290-92.) Donnelly asked for reconsideration of that decision (id. at 297-98), but the Great Lakes Program Service Center denied his request and affirmed the initial denial of his request for benefits, (id. at 421-32). Donnelly then requested, and was granted, a hearing before an administrative law judge ("ALJ"). After considering Donnelly's documentary evidence and testimony, the ALJ concluded that he is not entitled to widower's insurance benefits or to an earlier entitlement date for retirement insurance benefits. (Id. at 39.) The Appeals Council denied Donnelly's request for review (id. at 14-21), making the ALJ's decision the final decision of the Commissioner, *see Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Two months after the Commissioner's decision issued, Donnelly requested additional time to file a civil action, and in April 2011 the Appeals Council granted

2

him 30 days from the date he received the letter to file for judicial review. (A.R. 5-13.) On May 11, 2011, Donnelly filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

At his hearing before the ALJ, Donnelly—who at the time was proceeding pro se—submitted hundreds of pages of documents consisting mostly of lengthy, single-spaced letters that he had written to the SSA asserting that it had mishandled his claims for widower's and retirement benefits. The gist of those voluminous letters is that they convey Donnelly's belief that he would have received widower's insurance benefits ("WIB") from age 60 to 62 and retirement insurance benefits ("RIB") from age 62 to 65 had it not been for what he claims to be the misinformation he received from the SSA and its subsequent mishandling of his applications for those benefits. Specifically, Donnelly claims that he either called or went to his local SSA office in November 2003 and November 2005, and on those occasions SSA employees falsely told him that he was not eligible for WIB or RIB, respectively. Donnelly further claims that despite the SSA's misdirection, he filed an application for WIB in March 2004 and one for RIB in March 2006. According to Donnelly, the SSA never responded to his submissions. Based on his claim that the SSA misled him, Donnelly argues that he is entitled to an earlier filing date for his retirement benefits and back payments of the widower's benefits he says he should have received. *See* 42 U.S.C. § 402(j)(5); 20 C.F.R. § 404.633.

3

A.    **Donnelly's Documentary Evidence**

In 1993 Donnelly applied for and received a lump sum death benefit of $255 on the record of his deceased wife.  (A.R. 290.)  According to the SSA's records, that was the last contact it had with Donnelly until September 9, 2008.  (Id. at 56.)  But Donnelly submitted two documents that he says show that he sought the SSA's assistance with his eligibility for benefits on at least four occasions between 1993 and 2008.   The first is an SSA form OMB number 0960-0004, which is an Application for Widow's or Widower's Insurance Benefts.  (Id. at 60.)  Donnelly filled out the application and wrote the following in the section for remarks: "I called in last November (2003) for widower's benefits.  I was told I was not eligible.  I'm sending in this application just in case there may be other benefits I'm not aware of but I could apply for."  (Id. at 65.)  The form bears Donnelly's signature and is dated March 13, 2004, but bears no proof of mailing, filing, or receipt by the SSA.  (Id.)  The second document is an SSA form, Application for Retirement Insurance Benefits, bearing Donnelly's signature and the date March 15, 2006.  (Id. at 66-71.)  This time in the remarks section Donnelly wrote the following:

> I had applied for widower's benefits in November of 2003 when I became 60.
> I was told I was ineligible.  I sent in an application in the beginning of 2004 for
> any other benefits I may have been eligible for.  I did not receive a response.
> I called again in November of 2005 when I turned 62 to see if I had any
> benefits coming.  I was told to re-apply when I became 66 or at 65 for lesser
> benefits.  I am send [*sic*] in this application to see if I could apply for any other
> benefits I may not be aware of.

(Id. at 71.)  Again, this application bears no evidence of mailing, filing, or receipt by the SSA.  (Id. at 66-71.)

4

Other than the 1993 application for lump-sum benefits, the first recorded contact Donnelly had with the SSA took place on September 9, 2008. (Id. at 56.) On that day Donnelly went to the SSA district office located at 8658 S. Sacramento in Chicago ("the Sacramento office"). (Id. at 295.) He met with claims representative M. Maloy, who talked with him about his eligibility for widower's or retirement insurance benefits and helped him fill out the RIB application. (Id.) Donnelly's application was approved and he started receiving RIB that same month. (Id. at 74-76.)

In late 2008 and the early months of 2009 Donnelly made several additional visits to the Sacramento office. (Id. at 56-57, 302.) According to Donnelly, during one such visit in October 2008 an employee by the last name of Fontleroy told him that he should have been told that he was eligible for WIB, and that going forward, he should get everything in writing. (Id. at 82-83.) On November 3, 2008, Donnelly returned to the Sacramento office and submitted SSA form OMB No. 0960-0622, a form that allows a claimant to submit a request for reconsideration. (Id. at 92.) He attached to the form a letter stating that he had been misled by SSA staff into believing he was not eligible to receive benefits, when in fact he was. (Id. at 93.) He wrote that he called the SSA in 2003 to apply for WIB but was told he was not eligible. (Id.) He also wrote that in 2005, when he turned 62, he was again misinformed and told that he had to wait until he turned 65 to collect RIB. (Id.) He returned to the office on November 12, 2008, to check on the status of his request for reconsideration, (id. at 56), but according to Donnelly, an employee named Jamrozik told him that his application was lost. Donnelly resubmitted the OMB No. 0960-062 form, along with his

5

summary of several contacts he says he had with employees at the Sacramento office who, according to him, informed him that he was entitled to the earlier benefits. (Id. at 79-91.)

On March 27, 2009, District Manager Jim Flynn issued a decision denying Donnelly's request for reconsideration and for benefits beginning in November 2003. (Id. at 290-92.) Flynn gave several reasons why he did not believe Donnelly's assertions that he had been misled in 2003 and 2005, or that he had filed benefits applications in 2004 and 2006 that were left unanswered. Flynn found suspicious both that Donnelly was unable to name the people he claimed to have spoken to in 2003 or 2005 and that he said that he had visited an office on South Western on those two occasions. (Id. at 290.) Flynn wrote that while Donnelly would have been in the South Western office when he applied for a lump-sum benefit in 1993, by 2003 the office had moved to the Sacramento location. (Id.) He also found suspicious that Donnelly wrote in the remarks section of his 2004 application that he had called the SSA office, but on other occasions he contradicted that statement by saying he had visited in person. (Id. at 291.) He also found it implausible that Donnelly would have submitted an application for benefits after being told he was ineligible, or that the SSA would have ignored a properly submitted application. (Id.) Flynn also noted that during one of Donnelly's 2008 visits to the Sacramento office he had requested, and received, blank benefit application forms of the same type he claims he submitted in 2004 and 2006. (Id.) In short, Flynn believed that Donnelly had filled out the two applications in 2008 and then back dated them to 2004 and 2006 to make it appear that he had submitted applications for WIB and RIB despite allegedly being misled about his eligibility for those benefits. (Id.)

6

On the day of and in the days following Flynn's decision, several employees at the Sacramento office provided written narrative descriptions of their interactions with Donnelly on a given date. For example, R. Madden wrote that beginning in September 2008 she had been speaking with Donnelly by phone and in person about his allegation that he received misinformation in 2003 and 2005 about his eligibility for benefits. (Id. at 293.) She wrote that she never told Donnelly that she agreed with his claim that he is entitled to back payments of benefits and that she had encouraged him to submit documentation to support his claim. (Id.) Similarly, M. Maloy wrote that he met with Donnelly in September 2008 when he filled out his application for retirement benefits, and noted that "if there had been any allegation of an earlier application filed by the number holder, I would have made additional documentation to the file." (Id. at 295.) Flynn described a "long and contentious interview" with Donnelly and said that "[h]e is quite agitated and obsessed with his case." (Id. at 296.) As for Donnelly's allegation that he filed applications for benefits in 2004 and 2006, Flynn wrote that "[w]e believe he completed those himself within the last several weeks and is trying to pass them off as old apps submitted." (Id.) He noted that the case had been reviewed by two supervisors, both assistant district managers, and the district manager, and that he saw no evidence that Donnelly was ever misinformed or that he had submitted the 2004 and 2006 applications. (Id.)

In April 2009 Donnelly sought reconsideration of Flynn's decision. (Id. at 297-98.) In its lengthy decision denying Donnelly reconsideration, the SSA agreed with Flynn's concerns regarding the credibility of Donnelly's previous applications. (Id. at 421-32.) It

7

acknowledged that it is difficult to show that a claimant received misinformation when the SSA does not keep records of every contact, but found compelling the fact that the only evidence that Donnelly spoke with anyone at the SSA in 2003 or 2005 consists of his own allegations. (Id. at 429.) It agreed with Flynn that the inconsistency in Donnelly's representations as to whether he called or visited the SSA office in 2003 is suspicious, as is the fact that Donnelly first said he was told he was not eligible for widower's benefits because of changes in the SSA's program, but later said he was told he was ineligible because his wife had been a Catholic school teacher who did not contribute to Social Security. (Id.) The decision notes that it is against SSA policy for an employee to tell a claimant over the phone that he is ineligible for benefits. (Id. at 430.) The decision states that it would be "extremely unlikely" for an SSA employee to misinform a claimant about his eligibility for benefits on two occasions or that an office would fail to act on a properly filed application. (Id.) The decision also questioned the stark contrast between his aggressive pursuit of benefits beginning in 2008 and the virtual absence of any attempt on his part to follow up on what he describes as the SSA's inaction with respect to his 2004 and 2006 applications. (Id. at 432.) It also noted that the application forms he said he submitted are versions of the forms he was given during one of his 2008 visits. (Id.) For all of these reasons, the SSA denied Donnelly's request for reconsideration. (Id.)

8

**B.      Donnelly's Hearing Testimony**

Donnelly appeared pro se at his March 2010 hearing before an ALJ.  (A.R. 1211.)

The ALJ informed him about his right to have an attorney represent him, but Donnelly

testified that he wanted to waive that right.  (Id. at 1217.)  After admitting Donnelly's 36

exhibits into evidence, the ALJ asked him what he would like to say about his claim.  (Id. at

1219.)  Over the course of more than an hour, Donnelly gave his perspective on his situation.

He testified that he was told in 2003 by someone at the SSA that based on a change in Social

Security rules he would not be eligible for widower's benefits because his wife had a private

school teacher's pension, and according to the person he spoke with, she had not paid into

Social Security.  (Id. at 1221.)  Donnelly testified that he believed her statement because she

was in a position of authority, but decided he would fill out an application anyway to see if

he was eligible for anything else.  (Id. at 1222.)  According to Donnelly, he sent in an

application for WIB and when nothing happened, he "just assumed that what I was told was

right."  (Id.)  He testified that a similar thing happened when he turned 62 in 2005—that he

called the SSA and was told that unless he was disabled he would not be eligible for RIB

until age 65.  (Id. at 1222-23, 1226, 1243.)  Again, he believed that representation but in

March 2006 sent in an application to see if he was eligible for other benefits.  (Id. at 1225-

26.)

Donnelly explained that when he was about to turn 65 in 2008 he went to the

Sacramento office to ask about applying for Medicare.  (Id. at 1229.)  He had an interview

with an employee named Ms. Noelsco, and he told her about the 2004 and 2006 applications

that went without response from the SSA. (Id. at 1229-30.) Shortly after their interview Donnelly received notice that he is eligible for retirement benefits and Medicare. (Id. at 1231.) But Donnelly did not understand a letter he received about Medicare, so he went back to the Sacramento office. (Id. at 1232.) He met with Fontleroy who looked through his records and determined that Donnelly was eligible for WIB as of November 2003. (Id. at 1233.) But Fontleroy was unable to figure out the math associated with his benefits, so Donnelly met with Mr. Nyderek. (Id. at 1234-35.) Before Fontleroy left, he told Donnelly to start documenting in writing his contacts with the SSA. (Id. at 1236.) He also said that the people Donnelly met with when he applied for benefits in September 2008 should have told him that he was eligible for past-due benefits. (Id. at 1235.)

Donnelly testified that after Fontleroy left, Nyderek printed out an analysis of the WIB he should have been receiving. (Id. at 1240.) After Donnelly asked many times what other benefits he might have been eligible for, Nyderek grudgingly conceded that he could have been collecting early retirement benefits from the time he turned 62 in 2005. (Id. at 1241.) Donnelly testified that Nyderek gave him the Request for Reconsideration form seeking WIB from when he turned 60 and early RIB from when he turned 62. (Id. at 1242, 1244.)

Donnelly testified that he submitted his request for reconsideration on November 3, 2008, and nine days later he went back to the Sacramento office and was told that the request was lost. (Id. at 1244-45.) He was instructed to fill out a new application, which he did and submitted the next day. (Id. at 1247, 1249.) Donnelly waited three months with no response, so in March 2009, he called the SSA to check in, and shortly thereafter learned that his

10

request had been denied.  (Id. at 1251.)  Donnelly went back to the Sacramento office with the denial letter, where an employee named Madden became embarrassed and told him that his request for reconsideration had never left the office to go to the regional office.  (Id. at 1252-54.)  Donnelly then demanded to meet with several employees and the district manager to clear things up.  (Id. at 1255.)  They scheduled a meeting for March 27, 2009, but Donnelly and Flynn were the only two who showed up.  (Id. at 1256-57.)  Flynn told Donnelly to fill out yet another request for reconsideration.  (Id. at 1258.)

At this point in the testimony the ALJ said that he needed to take a break to hear some other cases, after which they would continue.  (Id. at 1261.)  The ALJ said that Donnelly would be called back after the ALJ heard from a few other claimants.  (Id.)  Despite that assurance, the ALJ did not reconvene the hearing.

## C.    The ALJ's Decision

After considering the proffered evidence, the ALJ issued a decision finding that Donnelly is not entitled to WIB or back payment of RIB.  (A.R. 39.)  The ALJ reviewed the evidence and gave a number of reasons why he ultimately did not believe Donnelly's claims that he was misinformed about his eligibility for benefits by SSA representatives in 2003 and 2005, or that he submitted written applications for WIB in 2004 and early RIB in March 2006.  (Id. at 27-38.)

The ALJ focused on the lack of evidence, beyond Donnelly's allegations, that the contacts he says took place between 2003 and 2006 actually occurred.  (Id. at 28-29.)  The ALJ noted that the SSA has no record that Donnelly called when he said he did, that

Donnelly had not identified who he spoke with, and that the applications that he claims he submitted in 2004 and 2006 show no evidence of mailing or time-stamped date. (Id.) Although in the remarks sections of those applications Donnelly wrote that he had previously contacted the SSA to ask about his eligibility for benefits, the ALJ found those statements to represent nothing more than a self-report by the claimant. (Id.) The ALJ ultimately found that the 2004 and 2006 applications "are not convincing evidence" because they "could have been filled out by the claimant at any time." (Id. at 28.)

In addition to finding the applications to be insufficient evidence that Donnelly was misinformed as he claimed, the ALJ found his description of the events implausible. The ALJ noted that under the state of events as Donnelly described them, he must have believed himself potentially eligible for WIB in 2003, because there must have been some information that prompted his call to the SSA. (Id. at 29.) According to Donnelly, he was told over the phone that he was ineligible but filed the correct application for WIB anyway, just in case it would help him obtain some other benefits. The ALJ found it doubtful that someone who had been misinformed about his eligibility would nevertheless submit an application for benefits, and do so on the correct form. (Id.) The ALJ also found incredible that Donnelly would not have followed up in any way when the SSA did not take any action on his application and when he lived relatively close to the SSA office. (Id.) The ALJ had the same doubts about the chain of events Donnelly described around his 2006 application, but found it especially incredible that he would have been misled as he claimed in the same way twice. (Id. at 29-30.) As the ALJ put it:

12

> It also makes no sense that a person of the claimant's insistence and persistence, which is self evident from a review of this record, would not intrepidly pursue the non-response that he allegedly received both on his purported written application for widower's benefits in 2004 and on his purported written application for retirement benefits in 2006, even allowing for, *arguendo*, what he supposedly had been told previously on the phone.

(Id. at 30.)

The ALJ also found Donnelly's testimony describing his post-2008 contacts with employees at the Sacramento office to be exaggerated. He noted that Donnelly testified that Nyderek had told him that he was entitled to both WIB retroactively to 2003 and RIB retroactively to 2005. (Id. at 32.) The ALJ found that this "has to be a stretch" because those benefits are not retroactive and Nyderek had no record that Donnelly had timely filed for them when he became eligible. (Id.) Donnelly also said that Madden told him he was entitled to retroactive benefits, but the ALJ again found it unlikely that an SSA employee would give him this false information. (Id.) The ALJ determined that if the agents had actually said those things, the implication was that they "swallowed whole hog, without more," Donnelly's assertion that he had been misinformed previously and misdirected from filing timely applications and so was entitled to past-due benefits. (Id.) The ALJ found that scenario unlikely given that Donnelly said they told him he should fill out a request for reconsideration to be reviewed by the regional office. (Id. at 32-33.) The ALJ found it far more likely that the SSA employees had only provided him information about what benefits he would have received had he timely applied because Donnelly "adamantly requested it,"

and that they were leaving to higher authorities any decision about the issue of whether he was entitled to back payments. (Id. at 33.)

Ultimately, the ALJ determined that "the bottom line" in the case is that there is no evidence beyond Donnelly's own assertions that he was misinformed by the SSA in 2003 and 2005 or that he timely submitted applications for WIB in 2004 or RIB in 2006. (Id. at 35-36.) The ALJ acknowledged that Donnelly had submitted a huge volume of papers that he said supported his claims, but found that evidence unhelpful because "the overwhelming bulk of the documents in the file are just the highly redundant, accusatory letters of the claimant which repeatedly reiterate his contentions." (Id. at 38.) The ALJ noted that without any proof that his applications were ever mailed or received by the SSA, all that is left is Donnelly's "improbable story" that he was misled on multiple occasions despite his timely efforts to pursue benefits to which he would have been entitled. (Id. at 36.) The ALJ found "completely wanting" Donnelly's argument that his evidence showing that the Sacramento office lost the request for reconsideration he submitted on November 3, 2008, supports his assertions that the SSA lost his 2004 and 2006 applications. (Id.) The ALJ reasoned that even if fully credited, "incompetence by identified and named agents of Social Security in these latter years" does not prove "the incompetence of unidentified and unnamed agents of Social Security in prior years." (Id.) For all of those reasons, the ALJ concluded that Donnelly had not shown that he had been misinformed or misdirected by the SSA with regard to his eligibility for WIB or RIB and that he is not entitled to WIB or to back-payment of RIB. (Id. at 38-39.)

14

**Analysis**

There is no dispute in this case that Donnelly became eligible for widower's insurance benefits when he turned 60 in November 2003, and that he became eligible for reduced retirement insurance benefits when he turned 62 in November 2005. Nor is there any question that the SSA allows a claimant who is misinformed by it to receive benefits stretching back to the date of the misinformation once the claimant files for benefits, as long as he credibly establishes that he was misled. *See* 42 U.S.C. § 402(j)(5); 20 C.F.R. § 404.633. The ALJ was tasked with determining whether Donnelly was misinformed in 2003 and 2005 about his eligibility for benefits and whether he timely applied for them, and resolved both of those questions in the Commissioner's favor. In moving for summary judgment, Donnelly argues that the ALJ held him to an unreasonable standard of proof to establish that he had been misled and submitted timely applications. He also argues that the ALJ failed to develop a full and fair record that is adequate to resolve those questions.

In reviewing an ALJ's decision to deny benefits a district court will ask only whether that decision is free of legal error and supported by substantial evidence, *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012), meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation omitted). Put otherwise, substantial evidence is "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This court's role is not "to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d

15

408, 413 (7th Cir. 2008). Instead, as long as substantial evidence supports the ALJ's decision, and the ALJ provides "an accurate and logical bridge" between the evidence and his conclusions, the court will affirm even "if reasonable minds can differ" over whether the applicant is entitled to benefits. *See Shideler*, 688 F.3d at 310; *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

## A.     The ALJ Did Not Hold Donnelly to An Unreasonable Burden

Donnelly's first argument in challenging the ALJ's decision is his contention that the ALJ committed legal error by requiring him to provide evidence above and beyond what is required by SSA regulations to satisfy his burden of production. The applicable regulation describes various forms of evidence that a claimant may submit to prove that he was misinformed. *See* 20 C.F.R. § 404.633(d). It describes as "preferred evidence" any written evidence that documents the misinformation, including a notice or letter that was addressed to the claimant or records of a telephone call or in-person contact. *Id.* § 404.633(d)(1). Other acceptable evidence includes the claimant's own statements about the time and date of the alleged contacts, how that contact was made, and who gave the misinformation. *Id.* § 404.633(d)(2)(i). But the regulation specifies that the SSA "will not find that we gave you misinformation . . . based solely on your statements." *Id.* § 404.633(d)(2). The regulations also make clear that the SSA will evaluate "the credibility and the validity of your allegations in conjunction with other relevant information." *Id.* § 404.633(d)(2)(iv). A general notice issued by the SSA acknowledges that providing corroborative information can be tricky, stating that there "may be little concrete or documentary evidence beyond the claimant's

statement." *See* POMS Section: GN 00204.008(F)(2), Misinformation—Applications, *available online at* https://secure.ssa.gov/poms.nsf/lnx/0200203008. That is because, among other reasons, contacts are not always documented and documents are sometimes purged. *See id.*

In arguing that the ALJ misapplied these standards, Donnelly first asserts that the ALJ "disregarded" the evidence that he sent in applications in March 2004 and March 2006 that he says corroborate his assertions that he had been misled by SSA employees. The ALJ hardly disregarded that evidence. In fact, the ALJ discussed those two applications in detail and thoroughly explained why he did not consider them corroborative evidence. He explained that the applications "are not convincing evidence" because there was no evidence that Donnelly in fact filled out the applications when he said he did and because "these applications could have been filled out by the claimant at any time." (A.R. 28.) And he found the applications inherently problematic as corroborative evidence because they "are not authenticated as sent or received but rely 100% on the testimony of the claimant." (Id. at 33.) In short, Donnelly is incorrect that the ALJ "disregarded" the applications. He considered the applications and explained his reasons for finding that they lack corroborative value. Because the ALJ's reasons find support in the record, this court will not second-guess them. *See Elder*, 529 F.3d at 413.

Donnelly also faults the ALJ for not considering his assertion that the SSA lost his first 2008 request for reconsideration as corroborative evidence of his allegation that the SSA mishandled the applications he says he submitted in 2004 and 2006. In essence, Donnelly

17

is arguing that because he can identify one instance of a document allegedly being mishandled in 2008, the ALJ should have assumed that the lack of corroborative evidence regarding Donnelly's previous applications must be explained by agency incompetence. But again, the ALJ *did* consider this argument and found its logic to be wanting. (A.R. 36.) He wrote that it "strained" reason to argue that an identified agent's 2008 mishandling of a request for reconsideration demonstrates that some unidentified agents must have mishandled his 2004 and 2006 applications or that other unidentified agents gave him bad information over the phone. The ALJ adequately explained why he was unpersuaded by Donnelly's argument, and this court sees no error in that explanation.

Next Donnelly argues that the ALJ held him to an impossible standard by faulting him for not producing the SSA's or his own phone records, evidence that he mailed the applications, or evidence of "an intrepid pursuit of SSA's non-response" to his 2004 and 2006 applications. (R. 53, Pl.'s Mem. at 8.) According to Donnelly, requiring this level of evidence "transmogrified the 'misinformation' statute into an illusory provision." (Id.) But the ALJ never said that Donnelly had to provide all of those categories of evidence in order to establish that he had been misinformed. Rather, the ALJ determined that without some evidence that the calls Donnelly described actually took place or that his applications were actually mailed or received, there is no evidence of misinformation beyond Donnelly's own statements. The regulations authorize an ALJ to consider phone records, and specifies that a claimant's statements, standing alone, are insufficient to establish that he was misinformed. *See* 20 C.F.R. § 404.633(d). It is clear from the ALJ's decision that in referencing the lack

of phone records, time-stamp, or other corroborating documentation, the ALJ was simply categorizing the kinds of evidence that might support his assertions but that are lacking here. (*See* A.R. 28-31.)

Nor is the ALJ's decision to discredit Donnelly based on his lack of dogged pursuit of the SSA's inaction between 2004 and 2008 problematic. True, Donnelly claims that he started his intense documentation in 2008 because that is when Flynn suggested it, but the ALJ found that the stark contrast between the pre- and post-2008 records made "no sense" in light of Donnelly's demonstrated "insistence and persistence" since 2008. The ALJ was in the best position to make that determination, and it is the kind of credibility decision that is specifically contemplated by the regulations Donnelly relies on here. *See* 20 C.F.R. § 404.633(d)(2)(iv). The bottom line is that the ALJ found Donnelly's description of the events from 2003 to 2006 to be implausible. Based on the absence of any outside evidence to corroborate his story, the ALJ did not believe that Donnelly was misled or that he filed the applications when he said he did. Because it cannot be said that the ALJ's credibility decision is "patently wrong," this court is bound to affirm it. *See Shideler*, 688 F.3d at 310-11.

## B. The ALJ Adequately Developed the Record

Donnelly also argues that this case should be remanded because when the ALJ adjourned the hearing and never reconvened it as promised, he violated his duty to develop an administrative record that includes a full and fair hearing. Donnelly correctly points out that an ALJ has a duty to develop a full and fair record, especially in a case where the

19

claimant is unrepresented, and that failure to do so in some cases constitutes good cause for a remand. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). But to justify a remand in such circumstances, the claimant must show how he was prejudiced by the existing record and provide something other than conjecture or speculation to show that additional evidence might have changed the decision. *See Shoenfeld v. Apfel*, 237 F.3d 788, 798 (7th Cir. 2001). That is because, as the Seventh Circuit has explained, "no record is 'complete'," and "[c]oncern for the need to get on with today's cases today and reach tomorrow's cases tomorrow, rather than next month, suggests that the federal judiciary accept reasonable assessments by administrative officials about how much evidence is enough." *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993). Accordingly, "a significant omission is usually required before this court will find that the Secretary failed to assist pro se claimants in developing the record fully and fairly." *Luna*, 22 F.3d at 692.

This court agrees with Donnelly that it is problematic that the ALJ did not follow through on his assurance that he would continue the hearing, but Donnelly has not adequately explained how he was prejudiced by that failure. Donnelly's hearing lasted for approximately an hour and 20 minutes. During that time, Donnelly explained his version of the events underlying the misinformation he says he received in 2003 and 2005, his decision to submit applications for benefits anyway in 2004 and 2006, and his dissatisfaction with the SSA's handling of his claims in 2008 and 2009. The transcript reveals a good deal of patience on the ALJ's part, in that he allowed Donnelly to go into detail about those

interactions and considered his exhibits as he presented them. In his opening brief, Donnelly does not explain what evidence he would have presented to the ALJ had he reconvened the hearing. After the government pointed out in its response that Donnelly would only be entitled to a remand if he showed prejudice, *see Shoenfeld*, 237 F.3d at 798, Donnelly argues for the first time in his reply that had the hearing been reconvened, the ALJ "would have gained insight into what post office Plaintiff utilized, why Plaintiff mailed the applications instead of hand-delivering, and why Plaintiff never followed up." (R. 46, Pl.'s Reply at 8.) Even putting aside the well-settled principle that arguments that are only developed in a reply brief are waived, *see Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011), Donnelly had more than adequate time in the course of the hearing, during which the ALJ allowed him to describe the events in detail, to provide those particulars. It is unclear why Donnelly believes his identification of the post office he says he used or his explanation of why he mailed the applications would change the ALJ's decision, because they would just be reiterations of his own contentions, not the kind of objective signs of authenticity that the ALJ was looking for. And contrary to his assertions, in fact Donnelly *did* explain his version of why he never followed up—according to him he believed the SSA agents' representations that he was not eligible for the benefits he said he applied for. (*See* A.R. 1222.)

Donnelly also asserts for the first time in his reply brief that if he had been given the chance, he would have informed the ALJ that his sister and daughter have "personal knowledge" that he mailed his applications as he said he did. (R. 46, Reply at 8.) Again, even putting aside the waiver problem, the stance he takes here is markedly non-committal.

Donnelly asserts that "[i]f the ALJ discovered that Plaintiff's sister and daughter had personal knowledge that Plaintiff mailed in the applications (for instance, because they were with him when he mailed them), it would have been incumbent upon the ALJ" to have them testify. (Id.) This raises more questions than it answers. Did the sister and daughter have personal knowledge? Did they accompany him to the mail box or post office? And if so, why would Donnelly, who has created a record of more than 1,200 pages consisting mostly of his detailed descriptions of the underlying events, not have pointed to this evidence earlier? Without more, even his reply argument is based on the kind of conjecture that does not meet the requisite showing of prejudice. *See Shoenfeld*, 237 F.3d at 798.

Donnelly's reliance on *Anderson v. Barnhart*, No. 04 CV 7049, 2005 WL 5613973 (N.D. Ill. Oct. 11, 2005), is also unhelpful. In *Anderson*, the district court found that an ALJ had failed to provide a full and fair hearing where he stated that he was postponing the hearing to collect more evidence, but never reconvened. *See id.* at *6. The district court described the hearing as "brief" and "partial," noting that the claimant had only given minimal testimony. *Id.* The court also identified several lines of evidence that could have been explored had the hearing been reconvened, including questions regarding a doctor's evaluation, opinions from medical or vocational experts, and more thorough testimony from the claimant. *Id.* Here, by contrast, Donnelly was allowed to testify at length and to introduce a number of exhibits he believed supported his claims. Donnelly himself described the ALJ as showing "patience" with him during the hearing. (A.R. 1253.) Donnelly cannot say that the ALJ's decision to cut the hearing short resulted in him being denied the chance

22

to present a full picture of his claims. *See Nelms v. Astrue*, 553 F.3d 1093, 1099 (7th Cir. 2009). Although it is obviously poor practice to inform a claimant that a hearing will continue and to not follow through on that statement, this court must conclude that here, the ALJ's failure to reconvene the hearing did not result in a sufficiently serious omission to justify a remand of his case. *See Luna*, 22 F.3d at 692.

Finally, Donnelly faults the ALJ for not asking the kinds of explorative, probing questions that he believes should have been posed given his pro se status. As Donnelly correctly points out, in a case where the claimant is unrepresented by counsel the ALJ has a duty "to ask questions that will elicit a full picture" of the claims. *See Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006). But again, an ALJ's failure to elicit testimony only requires a remand where the claimant shows that he was prejudiced by the missing evidence. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). Here Donnelly has not explained what facts a more probing set of questions would have revealed, and even in his reply brief he simply asserts that "[h]ad the ALJ probed the circumstances surrounding the applications, Plaintiff may well have provided new, favorable information" about his applications. (R. 46, Reply at 7.) Because he has not identified what that "favorable information" is or shown that it would have been likely to change the ALJ's decision, there is no need to remand to allow the ALJ to more fully develop the record. *See Schaaf*, 602 F.3d at 875 (noting that a claimant's contention that an ALJ's questioning was insufficiently probing "requires little discussion" where the claimant provides "no hint of what further evidence the ALJ would have elicited").

**Conclusion**

Donnelly's frustration as revealed in his lengthy chronicling of the events underlying his case is both palpable and understandable. He has made it clear that he suffers from serious health and financial difficulties and that receiving the back payments he seeks here would help allay some of those stresses. To realize that one could have received benefits that are no longer available is surely a difficult proposition for anyone to accept. That said, this court's role in this case is limited to asking whether the ALJ adequately explained his reasons for denying Donnelly benefits and whether those reasons have support in the record. The answer to both of those questions is yes. Accordingly, Donnelly's motion for summary judgment is denied.

ENTER:

Young B. Kim
United States Magistrate Judge

24